1              **UNITED STATES DISTRICT COURT**

2                    **DISTRICT OF OREGON**

3                    **PORTLAND DIVISION**

4

5  JOHN ALLEN GORDON,                )
                                     )
6              Plaintiff,            )      No. 03:11-CV-00245-HU
                                     )
7       v.                           )
                                     )
8  KLEINFELDER WEST, INC.,           )   **MEMORANDUM OPINION AND ORDER**
                                     )     **ON CROSS-MOTIONS FOR**
9              Defendant.            )        **SUMMARY JUDGMENT**
   _____   )

10

11

12 Daniel C. Lorenz
   521 S.W. Clay
13 Portland, OR 97201

14         Attorney for Plaintiff

15

16 Joanna R. Brody
   Scott Oberg Oborne
17 Jackson Lewlis LLP
   1001 S.W. 5th Avenue, Suite 1205
18 Portland, OR 97204

19         Attorneys for Defendant

20

21

22 HUBEL, Magistrate Judge:

23      The plaintiff John Allen Gordon brings this case against the

24 defendant  Kleinfelder  West,  Inc.  ("Kleinfelder")  for  damages

25 arising  from  Gordon's  termination  by  Kleinfelder  on  February 2,

26 2010,  and  events  occurring  immediately  thereafter.   The  case  is

27 before  the  court  on  motions  for  summary  judgment  filed  by  both

28 parties.   Gordon  seeks  partial  summary  judgment  on  the  issue  of

1 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  liability as to two of his claims against Kleinfelder; i.e., his
2  Third Claim for Relief, for malicious prosecution, and his Fourth
3  Claim for Relief, for conversion.[1]   Dkt. #24; *see* Dkt. #1-1.   He
4  also seeks summary judgment on all four of Kleinfelder's Counter-
5  claims, which seek damages for conversion, breach of contract,
6  violation of Oregon's Uniform Trade Secrets Act, and defamation.
7  *See* Dkt. #23, Kleinfelder's Amended Answer and Counterclaims.

8      Kleinfelder seeks summary judgment on all of Gordon's claims
9  against it, or alternatively, partial summary judgment on all
10 claims as to which no genuine issues of material fact exist.

11
12                          ***BACKGROUND FACTS***

13     There are few undisputed facts.   Kleinfelder is a nationally-
14 based science, architecture, and engineering consulting firm.   Dkt.
15 #26, ECF p. 7 (citing Dkt. #29, Izen Decl. ¶ 2).   In approximately
16 April of 2008, Kleinfelder hired Gordon as a Civil Design
17 Specialist, which required Gordon to perform civil site design and
18 plan development.   *Id.* (citing Izen Decl. ¶ 4).   According to
19 Gordon, one of the inducements for Kleinfelder to hire him was his
20 personal portfolio of CAD drawings that he could use in performing
21 his job.   Dkt. #24-2, Gordon Decl. ¶ 2; Dkt. #41, Gordon Decl.
22 ("Gordon Decl. #2") ¶ 2.   At the request of his then-supervisor,
23 Jay Beeks, Gordon put his CAD drawings onto the "D" drive on his
24 office computer.   *Id.*; Gordon Decl. #2 ¶ 2.

25
26
27     [1]Gordon also moved for summary judgment on his First Claim for
   Relief, for defamation, but he abandoned his motion for summary
28 judgment on this claim in his reply brief.   *See* Dkt. #56, p. 2.

2 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1    During his tenure at Kleinfelder, a significant amount of
2  Gordon's time was spent working on a wind power development project
3  (the "EverPower Project") for one of Kleinfelder's clients,
4  EverPower Wind Holdings, Inc.  Dkt. #26, ECF p. 7 & n.1 (citing
5  Dkt. #27, Att. 1, Deposition of John Gordon ("Gordon Depo"),
6  p. 153).  Beginning in January 2010, Peter Stroud, a Principal
7  Engineering Geologist for Kleinfelder, became Project Manager for
8  the EverPower Project, and served as Gordon's direct supervisor.
9  *Id.* (citing Dkt. #34, Stroud Decl. ¶ 3).  "The EverPower Project
10 involved potentially repurposing a logging tract into a wind farm."
11 *Id.* (citing Dkt. #30, Loftis Decl. ¶ 3).  As part of Gordon's work
12 on the EverPower Project, he participated in a feasibility study to
13 assess what types of vehicles could traverse the existing roadways
14 at the EverPower Project site.  Gordon spent two days at the site
15 obtaining information about culvert locations and the general
16 condition of culverts in the logging tract.  *Id.* (citing Gordon
17 Depo. pp. 149, 155-56, 161).  A Kleinfelder drafter, Taran Kratz,
18 accompanied Gordon to the site on the second day.  *Id.* (citing
19 Gordon Depo. pp. 161, 171).  Gordon recorded about 100 culvert
20 locations on a GPS device, and also recorded field data in
21 handwritten notes.  Dkt. #26, ECF p. 9 (citing Stroud Decl. ¶ 4;
22 Gordon Depo. pp. 330-31).  His intention was to transfer the data
23 into Kleinfelder's CAD system to generate maps and diagrams for use
24 in connection with the EverPower Project.  *See* Gordon Depo.
25 pp. 157, 164; Gordon Decl. ¶ 5.  According to Gordon, the EverPower
26 Project could not be completed without this data.  Gordon Decl.
27 ¶ 5.

28

3 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1    On February 2, 2010, Abraham Izen, who at that time was
2 Kleinfelder's Global Director of Renewable Energy, and Stroud,
3 Gordon's supervisor, met with Gordon and terminated his employment.
4 Dkt. #26, ECF p. 8 (citing Izen Decl. ¶ 7).  The parties dispute
5 the reason for Gordon's termination.

6    Kleinfelder claims Gordon was terminated due to poor work
7 product, poor attitude, uncooperative behavior, and unwillingness
8 to accept appropriate supervision.  Dkt. #26, ECF p. 8 (citing Izen
9 Decl. ¶ 6; Loftis Decl. ¶ 6, Ex. A).   Izen claims he informed
10 Gordon that he was being terminated for "poor work performance and
11 behavior," and he "gave Gordon a Performance Improvement and
12 Corrective Action form . . . that specified that Gordon was being
13 terminated based on his unsatisfactory work performance and the
14 fact that Gordon was uncooperative, disrespectful, and combative
15 with his supervisors."  *Id.*, ¶ 7.   According to Izen, Gordon
16 refused to sign the form, writing "Not true" next to the reasons
17 for his termination.  *Id.; see* Dkt. #27-1, ECF p. 70, "Performance
18 Improvement and Corrective Action" form dated 1/29/2010 (Gordon
19 Depo. Ex. 13).   Under "Reason for action," the form indicates,
20 "Unsatisfactory Work Performance - work is not completed in
21 accordance with the standards set by the company or the require-
22 ments of the position."  Dkt. #27-1, ECF p. 70.   Under "Facts and
23 Events," the form indicates, "Per attached documentation, [Gordon]
24 has been uncooperative, disrespectful and combative with senior
25 Kleinfelder staff.  He has also been resistant to accountability
26 and supervision."  *Id.*  Next to each of these items is a hand-
27 written notation, "Not true."  *Id.*

28

4 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Gordon claims he was told he was terminated as part of a reduction in force. On a "Separation Report" completed by Izen in connection with Gordon's termination, under "Reason for Separation," Izen noted, "Layoff/Reduction in Force." Izen Decl. ¶ 8; Dkt. #29-1, Separation Report. In his Declaration, Izen states he made that notation "so that Gordon would not have to disclose his performance-based termination to prospective employers," and also because he believed it "would help Gordon receive unemployment benefits." Izen Decl. ¶ 8.

At the end of the termination meeting, Gordon was instructed to arrange to meet with Stroud after regular business hours to retrieve his personal belongings from his office. Dkt. #26, ECF p. 9. According to Kleinfelder, as Gordon left the termination meeting, he showed Stroud a GPS device, stating it contained 100 culvert locations from the EverPower Project that had not been saved onto Kleinfelder's computer yet.[2] *Id.* (citing Stroud Decl. ¶ 4; Gordon Depo. pp. 330-31) Gordon also mentioned that he had his original field notes in the trunk of his car, if Kleinfelder wanted them. No action was taken at that time to transfer the GPS data or to retrieve Gordon's handwritten field notes. Gordon Decl. ¶ 3; Gordon Decl. #2 ¶ 5.

---

[2]It is not clear from the parties' briefs and the depositions whether Gordon had possession of the GPS unit containing the culvert locations at the time of the termination meeting, or it was in his car, or it actually was at Kleinfelder's offices but the data points just had not been entered on Kleinfelder's computer system yet. *See, e.g.,* Dkt. #26, ECF p. 9; Dkt. #27-1, Gordon Depo., pp. 330-31, 347-48, 350; Dkt. #28-1, Stroud's notes from meeting with Gordon on February 3, 2010; Dkt. #28-3, Officer Defrain's report stating Izen told her "he verified the GPS was not taken by Gordon."

1    Gordon called Stroud around 5:00 p.m. on February 3, 2010, to
2    arrange to retrieve his personal belongings. Dkt. #26, ECF p. 10
3    (citing Stroud Decl. ¶ 5). When Gordon arrived at the office,
4    Stroud accompanied him into his former office. *Id.* (citing Gordon
5    Depo. p. 342; Stroud Decl. ¶ 5). The parties have conflicting
6    versions of what occurred during and subsequent to this meeting.
7        Gordon claims that while he was in his office, he picked up a
8    piece of paper, previously retrieved from a recycling bin, that
9    contained a portion of an old map - a section of a larger map that
10   had already been filed of record in Lewis County, Washington. *See*
11   Dkt. #54-1, p. 33 (Gordon Depo. Ex. 14). Gordon claims he had
12   written personal telephone numbers and information relating to a
13   child support matter on the document, and the document contained no
14   proprietary or confidential information. Gordon Decl. ¶¶ 4, 8.
15   Stroud claims the document Gordon picked up was a large, folded
16   EverPower Project map belonging to Kleinfelder, which Stroud
17   believed contained proprietary information. Dkt. #26, ECF p. 10
18   (citing Stroud Decl. ¶ 5). Stroud told Gordon he could not take
19   the map because it was Kleinfelder's property, but Gordon refused
20   to relinquish the document, stating he needed the personal phone
21   numbers written on it. Dkt. #26, ECF p. 10 (citing Stroud Decl.
22   ¶ 5). A brief scuffle ensued during which Stroud attempted to
23   prevent Gordon from leaving the office with the document, but
24   Gordon was able to evade Stroud's attempt and he left the office
25   with the document. Gordon Decl. ¶ 1. Gordon claims Stroud
26   assaulted him, and threatened him with further assault. *Id.*;
27   Gordon Decl. #2, ¶ 6. Gordon also claims he was not allowed to
28   take his personal CAD drawings, some text files, and gaming "screen

6 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  shots" that he had placed on his "D" drive, as well as a personal
2  address book.    He claims these items belong to him, not to
3  Kleinfelder, and they have never been returned to him.   Gordon
4  Decl. ¶¶ 1, 2; Gordon Decl. #2 ¶ 7.

5      In addition, Gordon claims that while he was retrieving his
6  personal items, he again mentioned to Stroud that his field notes
7  were in the trunk of his car, if Kleinfelder wanted them, but
8  again, no one requested the information.    Gordon Decl. ¶ 6.
9  Subsequently, in a letter dated February 11, 2010, Gordon made a
10 formal offer, through his attorney, to deliver the handwritten
11 field notes to Kleinfelder; however, according to Gordon,
12 Kleinfelder never requested the notes until it served Gordon with
13 a request for production of documents in this case.   *Id.*

14     Gordon claims he never took any proprietary or confidential
15 information or data from Kleinfelder's premises, and the scrap of
16 the map he took with him had no intrinsic or monetary value to
17 Kleinfelder.   Gordon Decl. ¶¶ 4, 14.   He further claims he has
18 never used, shared, disseminated, or benefitted from any proprie-
19 tary information or trade secrets of Kleinfelder's.   *Id.* ¶ 15.
20 Gordon also claims that during his employment, Izen and other
21 Kleinfelder employees created a hostile work environment in an
22 attempt to dissuade Gordon from continuing to work at Kleinfelder.
23 Gordon Decl. ¶ 3; Gordon Decl. #2 ¶¶ 8, 9.   Gordon claims these
24 actions included publicly insulting him, demeaning his manhood,
25 publicly describing him as a "pussy," and systematically harassing
26 him.   *Id.*

27     Kleinfelder claims that on February 2 and 3, 2010, Gordon
28 asked three Kleinfelder employees to copy some Kleinfelder computer

7 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1   files for him, but all three of the employees refused.  Dkt. #26,
2   ECF p. 9 (citing Gordon Depo. pp. 333-37; Dkt. #31, Steel Decl.,
3   ¶ 4; Dkt. #33, Wells Decl. ¶ 4; Izen Decl. ¶ 15).  Gordon claims he
4   was only attempting to retrieve his personal computer files, and
5   not any of Kleinfelder's project files.  Gordon Decl. #2 ¶¶ 2, 3.
6       On February 3, 2010, Gordon called the Beaverton Police
7   Department, and reported that Stroud had assaulted him while he was
8   removing his belongings from his former office.  Dkt. #28, DeFrain
9   Decl. ¶ 3.   On February 4, 2010, after meeting with several
10  Kleinfelder employees, the police refused to pursue the assault
11  charge "based on a lack of supporting evidence." *Id.* ¶ 4.  During
12  these interviews, Izen told the police that Gordon had taken a
13  Kleinfelder map which was believed to contain confidential,
14  proprietary information.  Izen also told police that Gordon had
15  contacted several Kleinfelder employees in an attempt to obtain
16  confidential Kleinfelder computer files. *Id.* ¶ 5.  The investi-
17  gating officer told Izen that if a police report were filed, the
18  police would assume responsibility for returning Gordon's personal
19  property to him, and for retrieving Kleinfelder's property from
20  Gordon and returning it to the company. *Id.* ¶ 6.
21      Kleinfelder filed a police report, accusing Gordon of stealing
22  a map valued at $3,200 - a statement Gordon asserts Kleinfelder
23  knew was false at the time it was made. *Id.* ¶ 7 & Att. 2; Dkt.
24  #24-1, ECF p. 4.  On February 4, 2010, Kleinfelder was arrested on
25  criminal charges arising from the police report.  Gordon Decl. ¶ 9;
26  DeFrain Decl. ¶¶ 10-11.  He was taken into custody, handcuffed,
27  transported to the Washington County Jail, incarcerated, and
28  formally charged. *Id.* After further investigation, the Washington

8 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1   County District Attorney declined to prosecute Gordon, and the
2   criminal charge was terminated.  Gordon Decl. ¶ 10.  Gordon claims
3   he incurred $2,500 in attorney's fees in connection with the
4   criminal matter.  *Id.*

5        After Gordon's termination, he contacted David McClain at
6   EverPower, seeking employment with EverPower.  Gordon Decl. #2 ¶ 4;
7   Dkt. #32, McClain Decl. ¶ 4.  Gordon also offered to deliver his
8   field data regarding the EverPower Project directly to EverPower,
9   but McClain declined that request and told Gordon he should return
10  the field data to Kleinfelder.  Gordon Decl. ¶ 8; McClain Decl.
11  ¶ 4.  Gordon claims he was told by McClain that Kleinfelder was
12  asserting he had been terminated for cause, he "was incompetent to
13  perform the duties and responsibilities of his position as an
14  engineer," and he had committed the crime of theft.  McClain states
15  he was never told "Gordon was not competent to perform the duties
16  and responsibilities of his position, that he had been or was going
17  to be arrested, or that he had been stealing valuable information."
18  McClain Decl. ¶ 6; *see* Dkt. #46, McClain Decl. ("McClain Decl. #2")
19  ¶ 4.  Kleinfelder claims the only representation made was that
20  Gordon had been "let go," which was true.  Dkt. #26, ECF p. 14; *see*
21  McClain Decl. ¶ 5.

22       McClain acknowledges telling Gordon that Loftis had told him
23  Gordon had been terminated for cause, although McClain cannot
24  recall if that actually is what Loftis told him.  McClain Decl.
25  ¶ 7.  According to McClain, Loftis called him to advise him that
26  Gordon no longer worked at Kleinfelder.  McClain states Loftis also
27  told him "Gordon may have removed information from Kleinfelder
28

9 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  offices relating to the EverPower Project, and that the police
2  might be in contact with EverPower." *Id.* ¶ 5.

3
4                  ***THE PARTIES' CLAIMS IN THIS LAWSUIT***

5       In his First Claim for Relief, Gordon claims Kleinfelder
6  defamed him, damaging his ability to obtain employment, and
7  rendering him "sick, sore, nervous and upset."  In his Second Claim
8  for Relief, Gordon claims Kleinfelder's actions caused him to be
9  "deprived of his liberty and falsely imprisoned."  In his Third
10 Claim for Relief, Gordon claims Kleinfelder's actions "were wanton
11 and malicious, intending that [he would] be falsely accused and
12 prosecuted."  In Gordon's Fourth Claim for Relief, he claims
13 Kleinfelder converted his personal property.  In his Fifth Claim
14 for Relief, Gordon claims Kleinfelder intentionally inflicted
15 emotional distress on him. *See* Dkt. #1-1.

16      For its Counterclaims, Kleinfelder asserts Gordon converted
17 its proprietary information for his own purposes; he breached a
18 Confidentiality and Non-Solicitation Agreement entered into between
19 the parties as part of Gordon's employment; he removed a project
20 map containing trade secrets from Kleinfelder's offices, in
21 violation of Oregon's Uniform Trade Secrets Act; and he defamed
22 Kleinfelder to EverPower. *See* Dkt. #23.

23
24                    ***SUMMARY JUDGMENT STANDARDS***

25      Summary judgment should be granted "if the movant shows that
26 there is no genuine dispute as to any material fact and the movant
27 is entitled to judgment as a matter of law."  Fed. R. Civ. P.
28 56(c)(2).  In considering a motion for summary judgment, the court

1  "must not weigh the evidence or determine the truth of the matter

2  but only determine whether there is a genuine issue for trial."

3  *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002)

4  (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th

5  Cir. 1996)).

6      The Ninth Circuit Court of Appeals has described "the shifting

7  burden of proof governing motions for summary judgment" as follows:

8          The moving party initially bears the burden of
           proving the absence of a genuine issue of
9          material fact. *Celotex Corp. v. Catrett*, 477
           U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d
10         265 (1986).  Where the non-moving party bears
           the burden of proof at trial, the moving party
11         need only prove that there is an absence of
           evidence to support the non-moving party's
12         case. *Id.* at 325, 106 S. Ct. 2548.  Where the
           moving party meets that burden, the burden
13         then shifts to the non-moving party to desig-
           nate specific facts demonstrating the exis-
14         tence of genuine issues for trial.  *Id.* at
           324, 106 S. Ct. 2548.  This burden is not a
15         light one.  The non-moving party must show
           more than the mere existence of a scintilla of
16         evidence.  *Anderson v. Liberty Lobby, Inc.*,
           477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed.
17         2d 202 (1986).  The non-moving party must do
           more than show there is some "metaphysical
18         doubt" as to the material facts at issue.
           *Matsushita Elec. Indus. Co., Ltd. v. Zenith
19         Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct.
           1348, 89 L. Ed. 2d 528 (1986).  In fact, the
20         non-moving party must come forth with evidence
           from which a jury could reasonably render a
21         verdict in the non-moving party's favor.
           *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In
22         determining whether a jury could reasonably
           render a verdict in the non-moving party's
23         favor, all justifiable inferences are to be
           drawn in its favor.  *Id.* at 255, 106 S. Ct.
24         2505.

25 *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th

26 Cir. 2010).

27

28

11 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1                              *DEFAMATION*

2          Kleinfelder moves for summary judgment on Gordon's defamation

3   claim.  Gordon moves for summary judgment on Kleinfelder's defama-

4   tion counterclaim.  Gordon also moved for summary judgment on his

5   own defamation claim, but he conceded in his reply brief that

6   "there is a triable issue of fact as to the motivation of defendant

7   in speaking with David McClain at Everpower, and the issue of

8   qualified privilege which relates to the motivation issue, as one

9   which needs to be considered by a jury."  Dkt. #56, p. 2.

10         To prove defamation under Oregon law,

11              a plaintiff must show that the defendant made
                a defamatory statement about the plaintiff to
12              a third person.  *Wallulis v. Dymowski*, 323 Or.
                337, 342-43, 918 P.2d 755[, 758] (1996).  A
13              defamatory statement is a false statement that
                would subject the plaintiff "to hatred, con-
14              tempt or ridicule . . . [or] tend to diminish
                the esteem, respect, goodwill or confidence in
15              which [the plaintiff] is held or to excite
                adverse, derogatory or unpleasant feelings or
16              opinions against [the plaintiff]." *Farnsworth
                v. Hyde*, 266 Or. 236, 238, 512 P.2d 1003[,
17              1004] (1973). . . .

18  *Tubra v. Cooke*, 233 Or. App. 339, 349, 225 P.3d 862, 867 (2010).

19         Oregon law recognizes two privilege defenses to a defamation

20  claim: a qualified privilege and an absolute privilege.  An

21  absolute privilege is a complete bar to a plaintiff's claim.

22  However, absolute privilege applies only in a very narrow range of

23  circumstances, none of which is present here.  A qualified

24  privilege, on the other hand, generally "exists to protect three

25  kinds of statements: (1) those made to protect the defendant's

26  interests; (2) those made to protect the plaintiff's employer's

27  interests; or (3) those made on a subject of mutual concern to the

28  defendant and the persons to whom the statement was made." *DeLong*

12 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  *v. Yu Enterprises, Inc.*, 334 Or. 166, 170, 47 P.3d 8, 10 (2002)

2  (citing *Wallulis v. Dymowski*, 323 Or. 337, 350, 918 P.2d 755, 762

3  (1996), in turn citing *Wattenburg v. United Medical Lab.*, 269 Or.

4  377, 380, 525 P.2d 113, 114 (1974)).   To overcome a qualified

5  privilege, a plaintiff must "'prove that a defendant acted with

6  actual malice[.]'"  *Christianson v. State*, 239 Or. App. 451, 459,

7  244 P.3d 904, 908 (2010) (quoting *DeLong*, 334 Or. at 170, 47 P.3d

8  at 10).  "It must be borne in mind . . . that it is for the court,

9  and not the jury, to decide where the line is to be drawn between

10 a protected and an unprotected defamatory publication."  *Post v.*

11 *Oregonian Pub. Co.*, 268 Or. 214, 222, 519 P.2d 1258, 1261 (1974).

12    The court begins with a determination as to whether Gordon's

13 allegations potentially state a claim for defamation.   Gordon

14 claims that after his termination, Kleinfelder's employees

15 "informed David McLain [sic] at EverPower that [Gordon] had been

16 terminated for cause and had been arrested for stealing from

17 Kleinfelder . . . [and] that [he] was not competent to perform the

18 duties and responsibilities of [his] position as an engineer[.]"

19 Gordon Decl. ¶¶ 11, 13.  Gordon claims these statements were false,

20 Kleinfelder knew they were false, and the statements engendered a

21 negative image of him that prevented him from finding suitable

22 employment.  In his reply brief, Gordon characterizes his defama-

23 tion claim differently, asserting that the basis of the claim "is

24 the false statements by [Kleinfelder] that [Gordon] had been

25 discharged for cause, imputing both an unfitness for his profession

26 and lack of integrity in the discharge of [his] employment and an

27 inability or incompetency to pursue his trade or profession as a

28 civil engineer, together with the indication that [Gordon] had

1  removed information from the Kleinfelder offices relating to the
2  Everpower project, implying the commission of a theft." Dkt. #40,
3  p. 2.

4       Thus, we have two allegedly defamatory statements: (1) that
5  Gordon was terminated for cause, and (2) that he removed, impliedly
6  or expressly without authorization, information from Kleinfelder's
7  offices relating to the EverPower project.  Both of these alleged
8  statements are enmeshed with factual disputes.  With regard to the
9  first, Gordon claims he was terminated due to a reduction in force,
10 pointing to the form he was given that lists reduction in force as
11 the reason for his termination.  Kleinfelder claims Gordon was
12 terminated for cause, pointing to the termination forms that cite
13 performance-related reasons for the termination.  The determination
14 as to why Gordon actually was fired depends largely on the credi-
15 bility of the witnesses - a determination distinctly within the
16 jury's purview.

17      However, Kleinfelder argues even if it communicated to
18 EverPower that Gordon had been fired for cause, Gordon's defamation
19 claim fails for several reasons.  First, Kleinfelder claims such a
20 representation would have been true, because Gordon *was* fired for
21 cause.  As noted above, the reason for Gordon's termination is a
22 disputed question of fact that precludes summary judgment on that
23 basis.  Kleinfelder also argues such a representation, if made, was
24 privileged as a matter of law.  Oregon law "clearly recognizes that
25 a former employer has a qualified privilege to make defamatory
26 communication about the character or conduct of his employees to
27 present or prospective employers." *Walsh v. Consolidated Freight-*
28 *ways, Inc.*, 278 Or. 347, 355, 563 P.2d 1205, 1210 (1977) (citing,

14 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

*inter alia*, 3 Restatement of Torts 247, § 595 & comment (h)). The court finds that here, Kleinfelder's statements to EverPower - its existing client on whose project Gordon had been working prior to his termination - regarding the reason for Gordon's termination were privileged. The burden of proving Kleinfelder abused the qualified privilege rests upon Gordon. *See Walsh*, 278 Or. at 356, 563 P.2d at 1211. To do so, Gordon must prove Kleinfelder acted with malice. *Christianson*, *supra*.

The qualified privilege of a former employer to defame a former employee regarding the employee's character or conduct is a shield that protects an employer from *good faith communications* to a present or prospective employer; it is not a sword that allows the former employer to knowingly lie. If the jury believes Gordon was discharged due to a reduction in force, rather than for cause, then the jury could conclude Loftis knowingly lied to McClain for the purpose of damaging Gordon's reputation. Thus, the question of malice also is fraught with factual disputes, precluding summary judgment for Kleinfelder on Gordon's defamation claim.

As for the statement that Gordon had removed information from Kleinfelder's offices relating to the EverPower Project, the evidence indicates Loftis, Kleinfelder's Vice President and Global Director of Renewable Energy, contacted McClain at EverPower to tell him Gordon had been terminated. Loftis Decl. ¶ 8; McClain Decl. ¶ 5. According to McClain, Loftis told him that he might be contacted by the police because Gordon had removed information relating to the EverPower Project from Kleinfelder's offices. *Id*. McClain responded that he already had been contacted by Gordon, who stated he was no longer working at Kleinfelder, but he was avail-

able to work directly for EverPower to finish the EverPower Project. Loftis Decl. ¶ 9; McClain Decl. ¶ 5. Gordon told McClain he had notes that would assist EverPower in completing the project, and McClain told Gordon to return whatever EverPower information he had to Kleinfelder. McClain Decl. ¶ 4.

As with Loftis's statement regarding the reason for Gordon's termination, Loftis was passing along information to its client, EverPower, that was on a subject of mutual concern to EverPower and Kleinfelder. The statement, therefore, could be privileged - if it was not made maliciously. Regardless of the reason for Gordon's termination, what was the motivation for telling McClain that Gordon had stolen documents? It is disputed that Gordon took anything of value from Kleinfelder's offices. With regard to the field notes, the current record raises the issue of whether Kleinfelder had abandoned any claim to them, or at least had forgotten about them until this litigation was underway. Even after McClain told Loftis that Gordon had offered to give EverPower the field notes, no one from Kleinfelder contacted Gordon to request the field notes until they were requested during discovery in this case. On these facts, a jury could conclude that Kleinfelder's only motivation for telling McClain that Gordon had stolen documents from Kleinfelder was malicious, intended to damage Gordon's reputation and chill his attempts to gain employment. Too many material factual issues exist to prevent the jury from deciding this claim. Thus, Kleinfelder's motion for summary judgment is **denied** with regard to Gordon's defamation claim, as that claim relates to Kleinfelder's statements that Gordon was fired "for cause," and that Gordon had taken information relating

16 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  to the EverPower Project from Kleinfelder's offices and EverPower
2  might be contacted by the police.

3       Gordon makes another assertion of defamation in connection
4  with Kleinfelder's police report alleging Gordon had stolen a
5  project map with a value of $3,200.  Significant factual questions
6  exist regarding what Gordon actually took with him, its value, and
7  Kleinfelder's motivation for filing the police report.  Resolution
8  of these questions will affect the jury's decision as to whether
9  Izen acted maliciously in filing the police report.  *See DeLong*,
10 334 Or. at 173-74, 47 P.3d at 12 (citizens' statements to police
11 officers generally are subject to a qualified privilege, receiving
12 "protection only if they were made in good faith, to discourage an
13 abuse of the privilege"; citing Van Vechten Veeder, *Absolute*
14 *Immunity in Defamation*, 9 Colum. L. Rev. 463, 480 (1909)).
15 Therefore, Kleinfelder's motion for summary judgment on Gordon's
16 defamation claim with regard to the police report is **denied.**

17      Turning to Kleinfelder's claim for defamation, the company
18 alleges that subsequent to his termination, Gordon "falsely
19 informed Everpower that Kleinfelder had been overcharging Everpower
20 for work."  Dkt. #23, p. 8, ¶ 9.  In Gordon's deposition, he
21 testified he "explained to David McClain that . . . Kleinfelder was
22 planning on trying to overcharge them for work that was already
23 included in the scope. . . ."  Dkt. #43-1, p. 16 (Gordon Depo.
24 p. 299).  He also told McClain that Kleinfelder was "planning on
25 charging [EverPower] for stuff, for items that are already included
26 in the budget and [he] told them they had burned the budget by
27 bringing in Paul Fisher."  *Id.*, p. 17 (Gordon Depo. p. 300).
28 Gordon told EverPower that Kleinfelder had "burned the budget," and

1  was "looking to charge EverPower more money" for work that had

2  already been paid for.  *Id.*, p. 19 (Gordon Depo. p. 306).

3        Gordon argues these statements were true.  "It is axiomatic

4  that 'truth' is a complete defense in a defamation case." *Bahr v.*

5  *Statesman Journal Co.*, 51 Or. App. 177, 180, 624 P.2d 664, 666

6  (1981).  Kleinfelder disputes the truth of Gordon's statements.

7  However, neither party has offered any evidence beyond these bald

8  assertions on this issue.  As a result, the current record is

9  insufficient for the court to grant or deny summary judgment on

10 this issue, and Gordon's motion for summary judgment on

11 Kleinfelder's Fourth Counterclaim is **denied.**

12

13                        *MALICIOUS PROSECUTION*

14       The elements of a malicious prosecution claim under Oregon law

15 are as follows:

16            "(1) the institution or continuation of the
             original criminal proceedings; (2) by or at
17           the insistence of the defendant; (3) termina-
             tion of such proceedings in the plaintiff's
18           favor; (4) malice in instituting the pro-
             ceedings; (5) lack of probable cause for the
19           proceeding; and (6) injury or damage because
             of the prosecution."
20

21 *Blandino v. Fischel*, 179 Or. App. 185, 191, 39 P.3d 258, 261 (2002)

22 (quoting *Rose (Betty) v. Whitbeck*, 277 Or. 791, 795, 562 P.2d 188,

23 190, *mod. on other grounds* 278 Or. 463, 564 P.2d 671 (1977)).

24       Thus, to prevail on his claim for malicious prosecution,

25 Gordon must prove: (1) Kleinfelder instituted a criminal proceeding

26 against him; (2) the proceeding terminated in Gordon's favor; (3)

27 Kleinfelder did not have probable cause to institute the

28 proceeding; and (4) Kleinfelder "acted with malice; *i.e.*, a primary

18 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  purpose other than that of bringing [Gordon] to justice." *Ledford*
2  *v. Gutoski*, 121 Or. App. 226, 230, 855 P.2d 196, 198 (1993) (citing
3  *Rogers v. Hill*, 281 Or. 491, 497, 576 P.2d 328, 331-32 (1978);
4  *Fleet v. May Dept. Stores, Inc.*, 262 Or. 592, 601, 500 P.2d 1054,
5  1059 (1972)).

6      "In the context of a malicious prosecution claim, 'probable
7  cause' refers to the subjective and objectively reasonable belief
8  that the defendant committed a crime." *Blandino*, 179 Or. App. at
9  191, 39 P.3d at 261 (citation omitted).  The question of whether
10 Kleinfelder had probable cause to institute criminal proceedings
11 against Gordon is one of law.  *Fleet v. May Dept. Stores, Inc.*, 262
12 Or. 592, 601, 500 P.2d 1054, 1059 (1972) (citations omitted).
13 However, "[w]here the facts under which the defendant acted are in
14 dispute, it is the function of the jury, not the court, to resolve
15 the dispute." *Id.*  With regard to the question of malice, if the
16 facts surrounding the probable cause issue are in dispute, the jury
17 is entitled to consider whether the defendant's conduct was
18 malicious.  *Id.*  Cf. *Gustafson v. Payless Drug Stores Northwest,*
19 *Inc.*, 269 Or. 354, 356-59, 525 P.2d 118, 120-21 (1974) (observing
20 "that instructing on the issue of probable cause is very difficult
21 when the jury can find a number of different fact combinations,"
22 and discussing possible procedures for trial).

23     Here, the facts are in dispute.  Gordon claims Kleinfelder
24 knew he had taken nothing of value and no proprietary information.
25 Kleinfelder claims Izen believed Gordon had taken a proprietary
26 project map that would cost over $3,200 to recreate, and he
27 therefore had probable cause to file the police report.  The jury
28 must resolve the factual dispute before the court can make a

determination as to probable cause. Therefore, both parties' motions for summary judgment on Gordon's malicious prosecution claim are **denied.**

## *FALSE IMPRISONMENT*

Gordon claims Kleinfelder caused his false imprisonment on two separate occasions. The first occurred when Stroud allegedly prevented Gordon from leaving his former office. The second occurred when Gordon was arrested "based on incomplete and inaccurate information intentionally supplied to the Beaverton Police Department" by Kleinfelder. Dkt. #40, p. 8.

The Restatement (Second) of Torts, upon which the Oregon Supreme Court has relied in false imprisonment cases, *see, e.g.,* *Pearson v. Galvin*, 253 Or. 331, 454 P.2d 638 (1969), provides: "An actor is subject to liability to another for false imprisonment if (1) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it." Restatement (Second) Torts § 35. The defendant must actually confine the plaintiff, unlawfully restraining the plaintiff against his will. *Stone v. Finnerty*, 182 Or. App. 452, 458, 50 P.3d 1179, 1184 (2002) (citations omitted). However, no particular length of time is required to constitute false imprisonment; "[t]he restraint need not be for more than a brief time." *Lukas v. J.C. Penney Co.*, 233 Or. 345, 353, 378 P.2d 717, 720 (1963) (citing Restatement (Torts) § 35).

20 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1    Taking Gordon's allegations as true for purposes of
2 Kleinfelder's summary judgment motion, Gordon has stated a claim
3 for false imprisonment in connection with Stroud's alleged actions
4 in preventing Gordon from leaving his former office.  It is for the
5 jury to determine which version of the events - Gordon's or
6 Stroud's - to believe.  *See, e.g.*, *State v. Hyde*, 28 Or. App. 809,
7 813, 561 P.2d 659, 662 (1977) ("[I]t is for the jury, not the
8 court, to resolve conflicting evidence."); *see also, e.g., State v.*
9 *Guy*, 229 Or. App. 611, 616, 212 P.3d 1265, 1268 (2009) ("It is well
10 established in Oregon that the determination of a witness's
11 credibility is the sole province of the trier of fact.") (citations
12 omitted).  Kleinfelder's motion for summary judgment is, therefore,
13 **denied** as to Gordon's false imprisonment claim as it relates to the
14 events that occurred in Gordon's former office.

15    Considering Gordon's claim relating to his arrest, the
16 Restatement provides, "One who instigates or participates in the
17 unlawful confinement of another is subject to liability to the
18 other for false imprisonment."  Restatement (Second) Torts § 45A.

19    In *Pearson*, the court considered what is necessary to make out
20 a substantive case of "instigation."  The court relied on a comment
21 to Restatement § 45A, which provides, in pertinent part, as
22 follows:

23          "Instigation consists of words or acts which
            direct, request, invite or encourage the false
24          imprisonment itself.  In the case of an
            arrest, it is the equivalent, in words or
25          conduct, of "Officer, arrest that man!"  It is
            not enough for instigation that the actor has
26          given information to the police about the
            commission of a crime, or has accused the
27          other of committing it, so long as he leaves
            to the police the decision as to what shall be
28

21 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1                    done about any arrest, without persuading or
                     influencing them."
2

3   *Pearson*, 253 Or. at 335, 454 P.2d at 640 (quoting Restatement
4   (Second) Torts § 45A, comment c).   Thus, to prevail on his claim
5   for false arrest, Gordon must show that Kleinfelder "participated
6   by taking an active part in bringing about [his] arrest." *Pearson*
7   *v. Galvin*, 253 Or. 331, 337, 454 P.2d 638, 641 (1969).

8        Ordinarily, the filing of a police report alleging that a
9   crime has been committed would not be enough to hold Kleinfelder
10  liable for "instigating" Gordon's arrest and subjecting him to
11  false imprisonment.   "'Oregon follows the widely accepted principle
12  that a person is not liable for false arrest if he or she merely
13  lays facts before a law enforcement or judicial officer who makes
14  the arrest on the basis of the officer's own judgment and
15  discretion.'"   *Harrell v. Costco*, No. 08-cv-3092-PA, 2010 WL
16  331773, at *6 (D. Or. Jan. 27, 2010) (Panner, J.) (quoting *Hiber v.*
17  *Creditors Coll. Serv.*, 15 Or. App. 408, 418 n.13, 961 P.2d 898, 904
18  n.13 (1998)).

19       However, if Kleinfelder acted maliciously, with some improper
20  purpose or motive, then Kleinfelder would be liable for instigating
21  Gordon's arrest.   *See, e.g.*, *Brown v. Far West Fed. Sav. & Loan*
22  *Ass'n,* 66 Or. App. 387, 393, 674 P.2d 1183, 1186 (1984) ("public
23  policy will protect the victim of a crime who, **in good faith and**
24  **without malice**, identifies another as the perpetrator of the crime,
25  although that identification may, in fact, be mistaken.'" Emphasis
26  added.) (quoting *Shires v. Cobb*, 271 Or. 769, 772, 534 P.2d 188,
27  189 (1975)); *cf. Hiber v. Creditors Coll. Serv. of Lincoln County,*
28  *Inc.*, 154 Or. App. 408, 414-15, 961 P.2d 898, 902 (1998)

22 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  ("Consistent with principles of joint and several liability for
2  torts generally, liability for false imprisonment extends not only
3  to the person who directly confines a plaintiff, but equally to one
4  who instigates the confinement by directing, requesting, inviting
5  or encouraging it.") (citing *Pearson v. Galvin*, 253 Or. 331, 335-
6  37, 454 P.2d 638, 640-41 (1969)).  This is a different standard
7  from acting erroneously but in good faith.

8      Again, the determination will come down to the credibility of
9  the witnesses regarding Kleinfelder's knowledge and motivation in
10  filing the police report claiming Gordon had stolen a map valued in
11  excess of $3,200.  Kleinfelder's motion for summary judgment on
12  this issue is, therefore, **denied.**

13

14                          *CONVERSION*

15      The parties each assert a conversion claim, Gordon for
16  personal property left in his office and on his office computer;
17  Kleinfelder for the project map it claims Gordon took from his
18  office, and the field notes and GPS data relating to the EverPower
19  Project.  To state a claim for conversion under Oregon law, "'a
20  party must establish the intentional exercise of dominion or
21  control over a chattel that so seriously interferes with the right
22  of another to control it that the actor may justly be required to
23  pay the full value of the chattel.'"  *Mossberg. v. Univ. of Oregon*,
24  240 Or. App. 490, 494, 247 P.3d 331, 334 (2011) (quoting *Emmert v.*
25  *No Problem Harry, Inc.*, 222 Or. App. 151, 159-60, 192 P.3d 844, 850
26  (2008)).

27      Gordon claims Kleinfelder converted his personal CAD drawings,
28  certain text documents, and gaming screen shots that were on his

23 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  office computer, as well as his personal address book.  Kleinfelder

2  argues Gordon cannot show that the company acted with the intent to

3  control his address book, and Gordon "had no right to control the

4  data on his work computer, which indisputably belonged to

5  Kleinfelder[.]"  Dkt. #26, p. 20 (citing *Naas v. Lucas*, 86 Or. App.

6  406, 409, 739 P.2d 1051, 1052 (1987) ("Bad faith is not required;

7  the gravamen of the tort is the defendant's intent to exercise

8  control over the chattel inconsistently with the plaintiff's

9  rights.").  Kleinfelder asserts it has not been able to locate

10 Gordon's address book, and all of Gordon's personal property that

11 was located on Kleinfelder's premises was boxed up and given to the

12 Beaverton Police for delivery to Gordon.  With regard to the

13 computer files at issue, Kleinfelder argues Gordon never owned

14 those files, which constituted work product created for

15 Kleinfelder's use.  Kleinfelder points to its "computer policy,

16 which was given to [Gordon] as part of his hire packet," in arguing

17 none of the data on Gordon's computer belonged to him.  *See* Dkt.

18 #26, p. 21 (citing Dkt. #27-1, p. 77 - Ex. 21 to Gordon's Depo).

19     The company policy to which Kleinfelder refers is entitled

20 "Use of Kleinfelder Business Equipment and Communication Systems."

21 In section 4.2, Use of Electronic Media, the policy states, in

22 pertinent part:

23              Kleinfelder provides equipment and systems to
               all employees to assist in performance of
24             their job.  These systems include, but are not
               limited to telephone, fax, e-mail, voice mail,
25             computers, LAN/WAN, Internet access, Oracle,
               software, printers, and copiers.  These
26             systems are sole property of Kleinfelder, and
               access to them is provided for business
27             purposes. . . .  Employees have no privacy
               rights with regard to any information resident
28             on Kleinfelder's computers and/or computer

24 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1    networks.  Kleinfelder reserves the right to
2    access, intercept, review, and disclose the
     contents of all computer files and e-mail
3    messages.

4        .   .   .

5    1.  All messages, data, pictures, text, etc.
     **composed upon, or sent on these systems are**
6    **the property of Kleinfelder.**  They are not the
     private property of any employee.

7    Dkt. #27-1, p. 77 (emphasis added).

8        Kleinfelder further asserts that because "all information
9    found on the computer belonged to Kleinfelder, subsequent to
10   [Gordon's] termination, Kleinfelder removed the information it
11   needed from [the] computer and then, pursuant to company policy,
12   reformatted the computer to be used by another employee.  Any
13   information left on the work computer would have been erased."
14   Dkt. #26, p. 21 n.8 (citing Dkt. #Dkt. #29, Izen Decl. ¶ 23).
15   Further, Izen states that he instructed Kleinfelder's IT department
16   "to work with Gordon in retrieving his personal files from his work
17   computer, and [he] remember[s] that the IT department burned
18   Gordon's personal files onto a DVD for him." Dkt. #29, ¶ 23.  Izen
19   asserts Kleinfelder did not intentionally keep any of Gordon's
20   personal computer files. *Id.*

21       The "Use of Electronic Media" clause refers to information
22   "composed upon, or sent on" Kleinfelder's systems; the policy is
23   silent on the issue of an employee's personal computer files that
24   are stored on the company's computers.  Gordon claims his
25   supervisor at the time he was hired asked him to download his
26   portfolio of CAD files onto the "D" drive of his work computer; he
27   complied; and those files have never been returned to him.  He
28   further maintains that he left a personal address book in his

25 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

office, and Kleinfelder has refused to return the book to him.
Like many of the other issues in this case, resolution of this
claim comes down to a determination of whose version of the facts
is to be believed.   Gordon has offered evidence sufficient to
create a genuine issue of fact for trial.   The parties' motions for
summary judgment are **denied** as to Gordon's conversion claim.

As for Kleinfelder's conversion counterclaim, Kleinfelder
claims Gordon converted its proprietary information for his own
purposes, including the project map Kleinfelder has accused Gordon
of stealing, and the field notes and GPS data in Gordon's
possession at the time of his termination. Gordon has offered
evidence to refute Kleinfelder's claim, including evidence that he
tendered the field notes to Kleinfelder both informally and by
letter from his attorney, and his repeated assertions that the
portion of a map he took from his former office contained no
proprietary data and had no intrinsic value.   Indeed, in Gordon's
declaration, he identifies Dkt. #54-1, p. 33 (Gordon Depo. Ex. 14)
as that map.   Kleinfelder has not identified any proprietary
information on that document, but seems to question whether the
exhibit is, in fact, what Gordon took with him.   Again, the court
is faced with varying issues of material fact that must be decided
by the jury at trial.   Gordon's motion for summary judgment on
Kleinfelder's conversion counterclaim claim is **denied.**


### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

Gordon alleges that the actions of three Kleinfelder employees
- Amie Weitz, Kellie Stratton, and Abe Izen - created a hostile
work environment that intentionally inflicted emotional distress on

26 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1 Gordon, rendering him "sick, sore, nervous and upset," and
2 "interfer[ing] with his ability to seek and maintain gainful
3 employment[.]"  Dkt. #1-1, ¶ 13; Dkt. #27-1, p. 16 (Gordon Depo,
4 p. 242).  Regarding Weitz, Gordon testified that "she stormed
5 through the office trying to get people to say things about [him],
6 trying to get people to turn against [him].  It was her mission."
7 Dkt. #27-1, pp. 16-17 (Gordon Depo. pp. 242-43).  He stated Weitz
8 was extremely rude to him, and she instigated arguments "at every
9 opportunity."  *Id.*, p. 17 (Gordon Depo. p. 243).  She had "gossipy
10 type conversations with other employees," which he found "very
11 upsetting."  *Id.*, p. 18 (Gordon Depo. p. 244).

12      Gordon claims Izen demeaned him and made sexually-based
13 comments to him that were overheard by others.  He claims Izen made
14 statements about taking Gordon's "man card" on several occasions,
15 he called Gordon a "pussy" in front of other employees, and he
16 talked to Gordon like he was a five-year-old.  *See id.*, pp. 21-25
17 (Gordon Depo. pp. 261-63, 267, 281).

18      No testimony was elicited from Gordon during his deposition to
19 elaborate on his claim that Stratton contributed to the hostile
20 work environment.

21      In *Mayorga v. Costco Wholesale Corp.*, the Ninth Circuit Court
22 of Appeals, applying Oregon law, observed:

23           To succeed on a claim for intentional inflic-
             tion of emotional distress, a plaintiff must
24           prove: "(1) the defendant intended to inflict
             severe emotional distress on the plaintiff,
25           (2) the defendant's acts were the cause of the
             plaintiff's severe emotional distress, and (3)
26           the defendant's acts constituted an extra-
             ordinary transgression of the bounds of
27           socially tolerable conduct."  *McGanty v.
             Staudenraus*, 321 Or. 532, 901 P.2d 841, 849
28

27 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1               (1995) (internal quotation marks and citation

2               omitted).

3 *Mayorga*, 302 F. App'x 748, 749 (9th Cir. 2008); *accord Grimmett v.*

4 *Knife River Corp.-Northwest*, No. CV-10-241, slip op., 2011 WL

5 841149 (D. Or. Mar. 8, 2011) (Hubel, MJ); *see House v. Hicks*, 218

6 Or. App. 348, 357-58, 179 P.3d 730, 736 (2008) (IIED plaintiff must

7 prove defendants "intended to cause plaintiff severe emotional

8 distress or knew with substantial certainty that their conduct

9 would cause such distress"; their conduct was "outrageous . . .

10 *i.e.,* conduct extraordinarily beyond the bounds of socially

11 tolerable behavior"; and their "conduct in fact caused plaintiff

12 severe emotional distress") (citing *McGanty v. Staudenraus*, 321 Or.

13 532, 543, 550, 901 P.2d 841 (1995)).  "'A trial court plays a

14 gatekeeper role in evaluating the viability of an IIED claim by

15 assessing the allegedly tortious conduct to determine whether it

16 goes beyond the farthest reaches of socially tolerable behavior and

17 creates a jury question on liability.'"  *Ballard v. Tri-County*

18 *Metro. Transp. Dist. of Oregon*, No. 09-873, slip op., 2011 WL

19 1337090 (D. Or. Apr. 7, 2011) (Papak, MJ) (quoting *House*, 218 Or.

20 App. at 358, 179 P.3d at 736; and citing *Pakos v. Clark*, 253 Or.

21 113, 453 P.2d 682, 691 (1969) "('It was for the trial court to

22 determine, in the first instance, whether the defendants' conduct

23 may reasonably be regarded as so extreme and outrageous as to

24 permit recovery.')").

25     For conduct to be sufficiently "extreme and outrageous" to

26 support a claim for IIED, the conduct must be "'so outrageous in

27 character, and so extreme in degree, as to go beyond all possible

28 bounds of decency, and to be regarded as atrocious, and utterly

28 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

intolerable in a civilized community.'"  *House*, 218 Or. App. at
358-60, 179 P.3d at 737-39 (quoting *Restatement (Second) of Torts*,
§ 46, comment d).  The determination of whether conduct rises to
this level "is a fact-specific inquiry, to be considered on a case-
by-case basis, based on the totality of the circumstances."  *Id.*
However, although the inquiry is fact-specific, the question of
whether the defendant's conduct exceeded "the farthest reaches of
socially tolerable behavior" is, initially, "a question of law."
*Houston v. County of Wash.*, 2008 WL 474380, at *15 (D. Or. Feb. 19,
2008) (citation omitted).

On summary judgment, then, the court must assess whether, if
Kleinfelder's conduct as alleged by Gordon is proven at trial, that
conduct is sufficiently beyond the pale to state an IIED claim.
The court finds it is not.  Taking Gordon's allegations as true,
the conduct of Kleinfelder's employees, while objectionable and
likely upsetting, did not rise to the level of the "extreme and
outrageous" conduct required to sustain an IIED claim.  As I have
observed on previous occasions:

> Conduct that is merely "rude, boorish,
> tyrannical, churlish, and mean" does not
> support an IIED claim.  *Patton v. J.C. Penney
> Co.*, 301 Or. 117, 124, 719 P.2d 854, 858
> (1986).  "[T]he tort does not provide recovery
> for the kind of temporary annoyance or injured
> feelings that can result from friction and
> rudeness among people in day-to-day life even
> when the intentional conduct causing plain-
> tiff's distress otherwise qualifies for liabi-
> lity."  *Hall v. The May Dep't Stores Co.*, 292
> Or. 131, 135, 637 P.2d 126, 129 (1981); *see
> also Watte v. Maeyens*, 112 Or. App. 234, 237,
> 828 P.2d 479, 480-81 (1992) (no claim where
> employer threw a tantrum, screamed and yelled
> at his employees, accused them of being liars
> and saboteurs, then fired them all); *Madani v.
> Kendall Ford, Inc.*, 312 Or. 198, 205-06, 818

1          P.2d 930, 934 (1991) (no claim where employee
              terminated for refusing to pull down pants).
2

3   *Wolf v. Ron Wilson Center for Effective Living, Inc.*, slip op.,

4   2010 WL 4638888, at *5 (D. Or. Nov. 8, 2010).

5       Kleinfelder's motion for summary judgment on this claim is

6   **granted.**

7

8                     ***BREACH OF CONTRACT***

9       Gordon moves for summary judgment on Kleinfelder's counter-

10  claim for breach of contract.  Kleinfelder claims Gordon breached

11  the company's Confidentiality and Non-Solicitation Agreement (the

12  "Agreement") by retaining Kleinfelder's confidential information

13  for his benefit or in a manner adverse to Kleinfelder's interests,

14  and by disparaging Kleinfelder and its employees.  *See* Dkt. #3,

15  p. 9, ¶¶ 14-17; *see* Dkt. #43-1, pp. 60-63 (Gordon Depo. Ex. 4,

16  "Employee Covenants Agreement, Confidentiality and Non-Solicita-

17  tion").  In Gordon's motion for summary judgment on this claim, he

18  states only that his "Affidavit establishes that he made no such

19  breach, and [Kleinfelder] cannot contradict that assertion." Dkt.

20  #24-1, p. 5.

21      Gordon signed an "Employee Covenants Agreement - Confiden-

22  tiality and Non-solicitation" on April 15, 2008. Dkt. #43-1, pp.

23  60-63 (the "Agreement").  The "Confidentiality" covenants are

24  applicable to the period of time an employee is working for

25  Kleinfelder, and for two years thereafter.  The covenants require

26  employees to use "Confidential Information" only in the course of

27  performing their duties for Kleinfelder, and not for their

28  "personal benefit, for the benefit of any other third party, or in

30 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  any manner adverse to the interests of [Kleinfelder], its clients

2  or its or their affiliates[.]" *Id.*, ¶ 1(a).  Employees also are

3  required to "return all materials containing or relating to

4  Confidential Information to [Kleinfelder] when his/her employment

5  relationship with [Kleinfelder] terminates or otherwise upon

6  demand." *Id.*, ¶ 1(b).  This includes not retaining copies of

7  "correspondence, memoranda, reports, notebooks, drawings, photo-

8  graphs, databases, diskettes, or other documents or electronically

9  stored information of any kind relating in any way to the business,

10  potential business or affairs of [Kleinfelder], its clients or its

11  or their respective affiliates." *Id.*  Exempted are copies of

12  reports an employee is required to maintain as part of his/her

13  "professional registration." *Id.*

14       The Agreement defines "Confidential Information" as follows:

15              "Confidential Information" includes all
                trade secrets, know-how, technical, operating,
16              financial, and other business information,
                specifically including but not limited to
17              information regarding documentation, designs,
                inventions, improvements, methodology, con-
18              cepts, records, files, memoranda, reports,
                plans, price lists, client and supplier infor-
19              mation, product development and project pro-
                cedures.  Confidential Information does not
20              include general skills, experience or informa-
                tion that is generally available to the
21              public, other than information that has become
                generally available as a result of Employee's
22              act or omission.

23  *Id.*, ¶ 1.

24       Factual issues similar to those discussed above in this

25  opinion also exist regarding whether Gordon breached the confiden-

26  tiality covenants.  The parties dispute whether Gordon took any

27  confidential information with him, or retained any confidential

28

31 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  information without Kleinfelder's consent, whether actual or
2  implied.

3      The "Non-Disparagement" section of the Agreement prohibits
4  employees, "at any time (during or after Employee's employment with
5  [Kleinfelder])," from disparaging "the reputation of [Kleinfelder],
6  its clients and its or their respective officers, directors, agents
7  or employees." *Id.* ¶ 4. Little discussion is required to resolve
8  Gordon's motion for summary judgment on this clause of the
9  Agreement. Kleinfelder has offered evidence that Gordon solicited
10 employment from EverPower, and made statements to EverPower
11 indicating Kleinfelder intended to overcharge EverPower for work.
12 Kleinfelder further claims Gordon made disparaging comments to
13 EverPower regarding Kleinfelder employee Paul Fisher. The parties
14 dispute the exact content of Gordon's statements, and the intent
15 and impact of those statements.

16     Taking Kleinfelder's allegations as true for purposes of
17 Gordon's summary judgment motion, the court finds Kleinfelder has
18 offered evidence sufficient to raise a genuine issue of fact for
19 trial as to whether Gordon breached the Agreement. Gordon's motion
20 for summary judgment on this claim is **denied.**

21

22                    ***OREGON UNIFORM TRADE SECRETS ACT***

23     Gordon moves for summary judgment on Kleinfelder's counter-
24 claim asserting a violation of the Oregon Uniform Trade Secrets
25 Act, ORS § 646.461, *et seq.* Kleinfelder claims the project map
26 Gordon allegedly took from his former office, and information
27 Gordon disclosed to EverPower concerning Gordon's work on the
28

32 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

1  EverPower Project, constituted trade secrets under the Act.  Dkt.
2  #23, p. 10, ¶¶ 19-23.

3       The Act defines a "trade secret" as "information, including a
4  drawing, cost data, customer list, formula, pattern, compilation,
5  program, device, method, technique or process that (a) [d]erives
6  independent economic value, actual or potential, from not being
7  generally known to the public or to other persons who can obtain
8  economic value from its disclosure or use; and (b) [i]s the subject
9  of efforts that are reasonable under the circumstances to maintain
10 its secrecy."  ORS § 646.461(4).  Kleinfelder claims it "employed
11 reasonable measures to maintain the secrecy of the information
12 located on the project map and other trade secret information
13 wrongfully disclosed by [Gordon], and expressly instructed [Gordon]
14 not to remove the project map from [Kleinfelder's] offices."  Dkt.
15 #23, p. 10, ¶ 21.

16      As discussed previously in this order, the parties dispute
17 whether Gordon misappropriated the project map or other informa-
18 tion, as well as whether the document Gordon took with him had any
19 "independent economic value."   In addition, Gordon claims the
20 document he took with him was a portion of a map that already had
21 been recorded in the public record.  If that is the case, then the
22 document likely does not meet the definition of a "trade secret"
23 under the Act.  *See* ORS § 646.461(4)(a) ("'Trade secret' . . .
24 [d]erives independent economic value, actual or potential, from not
25 being generally known to the public. . . .").

26      The parties also dispute whether Gordon disclosed any infor-
27 mation to EverPower about the work it paid Kleinfelder to perform
28 that could be considered a trade secret.  These factual questions
33 - ORDER ON MOTIONS FOR SUMMARY JUDGMENT

present genuine issues for trial.  While Kleinfelder's eventual success on this claim is in doubt, I cannot say on this record how the issues will be resolved by the finder of fact.  As a result, Gordon's motion for summary judgment on this counterclaim is **denied.**

***CONCLUSION***

In summary, then, Kleinfelder's motion for summary judgment on Gordon's IIED claim is **granted**, and both parties' motions for summary judgment are **denied** as to all other claims and counterclaims.

IT IS SO ORDERED.

Dated this 5th day of March, 2012.

/s/ Dennis J. Hubel

_____

Dennis James Hubel
Unites States Magistrate Judge